# CASES DECIDED

# OCTOBER TERM, 1891.

EAST TENN., VA. & GA. RAILWAY CO. *v.* PERKINS.

1. There was no error in failing to give any of the requests for instruction, the court having covered the same by the general charge in so far as they were legal and appropriate.
2. The charge as a whole was correct, and covered all substantial questions involved in the case.
3. The verdict was not warranted by the evidence under the law, there being no sufficient ground for imputing to the defendant any negligence whatever in the matter of furnishing to the plaintiff an unfit instrument for the work in hand, but the evidence showing, on the contrary, that the plaintiff did not wait to have furnished to him such an instrument as the superintendent considered suitable and promised to furnish.

October 19, 1891.

Charge of court. Verdict. Negligence. Master and servant. Before Judge MARSHALL J. CLARKE. Fulton superior court. September term, 1890.

Perkins sued for damages, alleging as follows: He was employed by the defendant railway company in its shops as a machinist, and in the discharge of his duty endeavored to insert a set-screw in an eccentric. The hole was not properly tapped out, and as a consequence the screw would not go in correctly. It was impossible for him to detect this defect in the hole until he inserted the screw, as it was very small. As soon as he found that the screw would not go in, he notified the foreman, who endeavored to put it in but could only put it partly in. It had now got fastened in the hole, and the foreman directed him to cut the screw out with a chisel, which he endeavored to do, and had cut out the greater

part of it when the tapering form of the hole made it necessary for him to take another chisel. The first blow he struck with the second chisel, the chisel blurred, and by reason of this a chip of steel from the screw flew into his eye, destroying the sight. He was without fault or negligence; he had nothing to do with the tempering or preparation of the chisel. He could not have known of its defective tempering. It was the duty of a blacksmith, another employee of defendant, to temper the chisel, and any competent blacksmith in tempering a tool can put on it the proper temper. It was one of the tools furnished by defendant for his use, and the agent of defendant, the blacksmith, failed to temper it properly. The chisel blurred and broke off the chip of steel instead of cutting it off. Defendant was negligent in furnishing an improper chisel and one improperly tempered and not satisfactorily hard, and in not properly supervising the tempering and preparation of tools for plaintiff, who could not have avoided the injury by ordinary care.

On the trial the plaintiff testified: Was employed by the defendant company as machinist in its shops. Had been in that line of work eleven or twelve years, and commanded first class wages. Was engaged in chipping out steel set-screw of a cast iron eccentric; had a chisel in my left hand, a hammer in my right. Began work with drilling out the set-screw, running the drill clear through it; then took a chisel to separate or cut out the drilled part. The first chisel I took up not being of the right shape, I took another. Was holding my hands properly; was doing the work according to the direction of the foreman, whom I had to obey. I had hit two or three blows when the chisel, being soft, blurred instead of cutting, and caused the steel from the set-screw to break and fly into my eye, putting it out. I got the chisel from the company when I went there, like

they get all other tools; they are furnished with those tools which are furnished by the company. The blacksmith is employed to temper the tools. I could not tell whether a tool was properly tempered or not, until I used it; that was the only way I had to judge; I had no knowledge of the defectiveness of this tool; had not used it before I was hurt. Know of no way to have prevented the chip from flying into my eye. Do not remember the foreman's telling me that the first chisel was too large and not to use it, and that he would go and get a chisel to do the work with; remember his telling me, "I will go and get you a chisel," and I said, "I have got one here." The foreman was behind me, hurrying me all the while; and in using the chisel I thought I was obeying the foreman's orders hurrying through. Thought I had as much right to use a chisel furnished by the company as the one that the foreman would bring. He told me he would go and get me one, and while he was gone I got the one now exhibited here in court, and used it; I do not know whether he brought a chisel back with him or not. He said to me, "I will try and get one." I found one in my possession that was given me for that purpose, and felt at liberty to use it. I went to the drawer furnished me by the company for keeping tools, and got one; he did not go to the same place that I went after he left; I went immediately to my drawer, which was about eight or ten feet from where I was working, and got this chisel that hurt me and commenced to use it. I went to my drawer, got that chisel and said, "That won't do, I will put that back." The foreman said, "I will go and get you one." When I returned to my drawer I found a chisel that was proper for that work. I did not stand and wait for him to bring one that he had gone for. I am not able to state whether he saw that the chisel was improper for that work. I told him when I took the chisel out of the

drawer, "That won't do, I will have to get another one." He said, "I will go and get you one." He never told me not to use that chisel; he gave me no instruction to wait. I don't know what understanding he had that I was not to use that chisel. I did not hear him tell me to hold on. I said, "That won't do." I don't know whether he agreed to what I said or not; he said he would go and get one for me to use. Being hurried, I seized the first opportunity to get the first chisel that I could to get out the work. I don't know how long it had been in my custody. We get the tools at different intervals, and when one gives out we get another. I worked for the company between six and seven years; I worked seven different times; the last time was probably a little over a year. I had used this chisel a good many times in the same class of work, chipping out hole or drawer at centre. I kept it in my possession and under my control. I can't say whether or not I had discovered any defect in it while using it in my work. A chisel can be defective by temper, and it can be tempered right at one time and wrong at another. If tempered right, its work will progress right, and *vice versa*. That same chisel may have been used a year before under a temper, and at another time under an improper temper. Steel has no temper; it has to be tempered. I discovered nothing improper in it, that I know of, just before this time. I may have found chisels too hard or soft on several occasions, and gone and told the blacksmith, "You have tempered this right good, and tempered it right for me." I do not remember the day I used this chisel last before injured. I had it retempered and dressed by the company's blacksmith. We ground it down—this was probably a day or two before injured. I did not use it after it was dressed until this time. I ground it just enough to make a sharp point on it; after grinding it I saw no evidence of improper tempering. No one could

tell by looking at it that it was not all right.   When it blurred it caused the steel to break.   If the steel had not blurred it would have cut smoothly through.   In making the first three licks I did not discover that it was not cutting; I did not discover it until I felt the piece come into my eye.   I had no chance of observing it at all until the time that I received this injury.   I could not tell from the number of licks made whether it was cutting or not, because the chisel, being soft, would not affect the set-screw until it either broke it or blurred the chisel.   After the work was done I could not have told whether the chisel had done its work right or not.   Cannot tell by one lick.   A man does not make a severe lick in the start; he has to guard his hammer; he has to make a couple of licks to get his hand in position, before he gives it the full power of strength.   Neither myself nor any one else could have discovered that the chisel was not doing its work properly, until he had given it several licks; there was no way for me to ascertain if it did its work properly, but by putting it to use.   The set-screw is not liable to break with the proper tools and struck properly.   A machinist has no fear of chipping anything that can be drilled; we can chip at even harder substances than we can drill out.   Chipping is cutting off by pieces.   It does not fly about if chipped off properly and the tool is in proper condition.   We cannot tell exactly where the chips will fall, but we can guide the course of them, if we have a proper chisel, tools, etc. The difference in the force of the blow would not change the force of the chip; it might change the length of the distance it might fly.   That has been my experience. That chisel is the correct shape.   Putting the set-screw into the eccentric, my business was to clean out the hole and see that it was free from dirt or anything that would stop the progress of the set-screw and the oil in it, and then take a wrench and screw it in, and proceed until I

got it in probably one half or five eighths to the bottom, until the threads began to get tight. When it began to get tight I took it out. It was tapering or not straight, or the hole was not straight. I had no opportunity of finding out that until it got caught. Have put in hundreds of them, and never had one to act that way before.

For the defendant the testimony of the foreman and the blacksmith tended to show the following : The blacksmith who dressed the chisel had been in the business for about ten years, and had dressed tools for the defendant for about three years, and was a competent workman. He dressed the chisel in the usual and proper manner, omitting nothing that he could have done to bring it to a proper temper. A set-screw is made of tempered steel. In chipping it out the steel is likely to fly from it or from the chisel. Tools properly tempered have been seen both to break and blur. After the plaintiff had chipped as much as an inch through the set-screw, the foreman saw that the chisel was too large and would spoil the hole of the eccentric. He said, " That won't do, Frank, hold on, and I will get you another chisel," and heard no reply. Not anticipating any accident, he went to get a gouge chisel, was gone not over two minutes, and on returning found the plaintiff holding his injured eye. The chisel brought by the foreman was handed to another man who finished the job with it and returned it in good shape. It was the same kind of chisel that the plaintiff used, but longer and slimmer. In using a chisel, a man will know from experience where to keep his eye to protect it. In chipping down in a hole, by putting his hand a little to one side, by the direction of the chisel, he could protect himself, or he could put a piece of waste around his hand and cover up the hole ; and if he wanted to look into the hole he would have to stop hammering. A skillful man can have more or less control over the direction the chips

fly; he can hardly control the direction a piece takes when it breaks instead of being cut off; when a chisel blurs, it is much more apt to break than cut. The plaintiff received the pay of a first class machinist, who is supposed to be competent to select tools for ordinary work, but they do not always do it. The foreman did not pretend to direct always what particular tool they should use, as he expected them to know how to select for themselves. He did not order the plaintiff not to use any other tool in his absence, as he thought his order to hold on implied that; he wanted to be the judge of that matter because he wanted to protect the hole in the eccentric. The plaintiff bored the eccentric out so as to fit the axle. Then it was necessary to put the set-screw in so as to put it on the mandril. He put the set-screw in and it became stuck there so that he could not move it. He called the foreman's attention to it, and the foreman saw that he could move it down, by using force, far enough to clamp on the axle, and told the plaintiff not to mend it. Plaintiff replied that he got the set-screw stuck and would rather get it out; that he would drill it out and get the job done in time; to which the foreman assented. The plaintiff drilled a hole through the centre of the set-screw, and then took the chisel to chip out the pieces that were left in the eccentric; and after chipping out to some extent, the foreman told him to hold on, and went for another chisel, as above stated.

A verdict for the plaintiff was rendered, and the court overruled a motion by the defendant for a new trial, the grounds of the motion being that the verdict was contrary to law and evidence, and for refusal to give certain instructions as requested.

DORSEY, BREWSTER & HOWELL and A. O. BACON, for plaintiff in error.

HOKE & BURTON SMITH and J. R. WHITESIDE, contra.

LUMPKIN, Justice.

1–2. Plaintiff in error made to the court below several written requests to charge the jury, many of which were legal, and some of which were not. The general charge was a correct presentation of the law applicable, and covered not only the above mentioned requests in so far as they were legal, but also all substantial questions involved in the case. This is all a charge should be required to do.

3. The facts adduced upon the trial appear in the reporter's statement, and show, we think, that the verdict should have been in favor of the defendant. It was not foreseen that any instrument specially adapted to the work in which plaintiff was engaged at the time he was injured would be needed, because this particular work was itself made necessary by an accident. As soon as the emergency arose, the superintendent not only offered to supply plaintiff with a proper instrument with which to do this work, but promptly went off to secure one, and was actually bringing it to plaintiff when the injury occurred. Plaintiff, however, chose to rely upon his own experience and judgment, selected a tool from a large number which had been put in his charge, and began work before the superintendent could possibly supply one which would be proper. The instruments from which plaintiff made his selection were not specially designed to do the particular work made necessary by the emergency which had arisen, the evidence showing that such work required a more perfect tool. It is probably true that the tool with which plaintiff attempted to do this work was not a proper one for the purpose, but the company did not hold it out as such, as plaintiff must have known; and to say the least, he might have waited until the return of the superintendent with what the latter considered a proper instrument for this occasion.

Such an accident as this is likely to happen at any

time, and may have occurred no matter what sort of chisel the plaintiff had used. It was one of those unfortunate occurrences incident to the employment in which he was engaged,—an accident which in all probability no amount of diligence on the part of either plaintiff or defendant could have prevented. It is a well established rule of the law that every man, when he enters upon a particular employment, must assume the risks and hazards usually pertaining thereto, and accordingly, the plaintiff, under the facts disclosed by the record, was not entitled to any recovery against the defendant.                        *Judgment reversed.*